13 N.Y.2d 185 (1963)
The People of the State of New York, Respondent,
v.
Post Standard Company et al., Appellants.
Court of Appeals of the State of New York.
Argued September 30, 1963.
Decided November 21, 1963.
John C. Kinney and Thomas R. Newman for appellants.
Joseph A. Ryan, District Attorney (Helen B. Norem of counsel), for respondent.
Arthur B. Hanson, Calvin H. Cobb, Jr., and Emmett E. Tucker, Jr., for American Newspaper Publishers Association, amicus curiæ.
Judges FULD, BURKE and SCILEPPI concur with Judge FOSTER; Chief Judge DESMOND dissents and votes to affirm in an opinion in which Judges DYE and VAN VOORHIS concur.
*187 FOSTER, J.
The corporate defendant, publisher of a daily newspaper in the City of Syracuse, New York, and its individual employees, have been indicted for the crime of contempt of court in violation of subdivision 7 of section 600 of the Penal Law for falsely publishing an alleged statement made by a person in a judicial proceeding before the County Judge of Onondaga County. The County Court sustained a demurrer to the indictment. The Appellate Division reversed and directed a reinstatement of the indictment.
The indictment is couched in the following language:
"The Grand Jury of the County of Onondaga by this indictment accuse THE POST STANDARD COMPANY, HENRY H. KELLER, MARIO ROSSI, LOREN BAILEY and JOHN N. WHITNEY, of the crime of Contempt of Court, in Violation of § 600 (7) of the Penal Law of the State of New York, Misdemeanor, committed as follows:
"The said THE POST STANDARD COMPANY; Henry H. Keller, Publisher; Mario Rossi, Managing Editor; Loren Bailey, News Editor; and John N. Whitney, City Editor; on or about the 18th day of July, nineteen hundred sixty-two, at the City of Syracuse, in this county, did publish a false and grossly inaccurate report of the proceedings of the Onondaga County Court, held in Part I *188 thereof, at the County Court House in the City of Syracuse, New York, on the 17th day of July, 1962, the Honorable Leo W. Breed, Judge presiding, in that the defendants did, in the first six editions of the newspaper known as the The Post Standard, dated July 19, 1962, falsely report the proceedings of the said Court as follows:
"`Jail Probe Cases

"`DEPUTY HELD: SARDINO
ACCUSED OF BEATING
"`. . . Meanwhile, it was revealed that on Tuesday a man charged in County Court that he was beaten by Sgt. Thomas Sardino of Dist. Atty. Joseph A. Ryan's staff. Percy Lee Holloway said that while Sardino beat him, another policeman held a cocked gun in his ear.
"`. . . Holloway said Sardino punched him in the stomach and knocked him to the ground when he said he didn't know anything. Holloway told Judge Breed that while he was on the ground the other policeman put the barrel of a pistol in his ear, cocked the weapon and told him to "start remembering."'
"The said portions of the newspaper story aforesaid were false and grossly inaccurate, in that the said Percy Lee Holloway made no accusations concerning Sgt. Thomas Sardino, all as shown in the official minutes of the said proceedings; and the said publication of the false and inaccurate statements aforesaid are in violation of § 600 (7) of the Penal Law of the State of New York and against the Peace of the People of the State of New York and their dignity."
Subdivision 7 of section 600 of the Penal Law provides:
"A person who commits a contempt of court, of any one of the following kinds, is guilty of a misdemeanor: * * *
"7. Publication of a false or grossly inaccurate report of its proceedings. But no person can be punished as provided in this section, for publishing a true, full, and fair report of a trial, argument, decision, or other proceeding had in court."
The People argue that, since the indictment is in the language of the statute, it is not susceptible to demurrer on its face, and the Appellate Division so held. Ordinarily this is the rule (People v. Farson, 244 N.Y. 413), but the rule is not fixed and *189 invariable where circumstances dictate otherwise. The County Court held that the words "commits a contempt of court" found in the opening paragraph of the statute limit and qualify the language found in subdivision 7 thereof. In other words the County Court held, and the defendants so argue, that, in order to constitute a crime under the statute, the publication must not only be false or grossly inaccurate but it must also intentionally assail the dignity and authority of the court.
It may be observed that the indictment under attack does not allege an intent to make a false or grossly inaccurate publication or to deny the dignity and authority of the court. The Appellate Division held that, since the indictment is in the language of the statute, intent is not an element of the offense, and cites a case from the Supreme Court of Rhode Island as authority for this determination (Matter of Providence Journal Co., 28 R. I. 489). That case, however, dealt with a misstatement as to the decision of the court and not with a mere error in testimony. The court there held that the publisher of a newspaper who undertook to inform the public of a court's decision did so at his peril, and a misstatement was contemptuous even though there was no intentional misrepresentation. Aside from the factual difference between that case and the present one, it may be said such a drastic rule has never heretofore been applied in this State.
Apparently there are no cases in this State which have been decided directly under subdivision 7 of section 600 of the Penal Law. As a matter of fact no publication has been held punishable in this State under the Judiciary Law since the 1829 Revised Statutes (see 28 Col. L. Rev. 560). This may not be directly relevant to the matter at hand, but it seems rather extraordinary in view of the stringency with which the Appellate Division has construed the contempt statute in the Penal Law.
The Judiciary Law has a virtually identical paragraph, subdivision 6 of section 750. The preamble to this statute is more decisive in its terms than the opening paragraph of section 600 of the Penal Law. It says: "A. A court of record has power to punish for a criminal contempt, a person guilty of any of the following acts and no others". Then follows, among other acts, "6. Publication of a false, or grossly inaccurate report of its proceedings". Despite this decisive language, which on its face would make the mere publication of a false report sufficient *190 without further ado, this court has held that an intent to defy the dignity and authority of a court is a necessary element of a criminal contempt (People ex rel. Munsell v. Court of Oyer & Terminer of County of N. Y., 101 N.Y. 245; Matter of Rotwein [Goodman], 291 N.Y. 116; Matter of Spector v. Allen, 281 N.Y. 251; People ex rel. Bernstein v. La Fetra, 171 App. Div. 269, affd. 219 N.Y. 591). While the cases cited do not deal specifically with the publication of a false report as to testimony, the principle involved would appear to apply to all criminal contempts enumerated in the Judiciary Law section. I am unable to perceive any valid reason why this principle should not be applied to the penal statute under consideration. Both the provisions of the Judiciary Law and the Penal Law stem from the Revised Statutes of 1829. (For a discussion of criminal contempt by publication in the United States, and a review of New York legislative history, see 28 Col. L. Rev. 401, 415-422, 525.)
It is said that since the defendants may have a jury trial that this distinguishes a criminal proceeding from a summary common-law contempt proceeding. If the Appellate Division is correct, the protection afforded by a jury trial is illusory. It would permit a conviction for criminal contempt on the basis of a false publication without regard to any intent to impinge upon the dignity of the court or to interfere with the administration of justice. It would permit a conviction for the slightest falsity, irrespective of whether such deviation from the actual facts is intentional or merely inadvertent, significant or insignificant, and proximate or remote. In short, if the falseness of the report is established, and here it must be assumed, the decision of the Appellate Division would deprive the defendants of any defense before a jury. I do not ascribe any such intent to the Legislature in the enactment of section 600 of the Penal Law, and hence am constrained to the belief that it had in mind the historic conception of contempt, which embraces an intent to impugn or defy the dignity and authority of a court, and the descriptive language of the Penal Law (§ 600) only comes into play when a contempt, within the meaning of the term accepted for many decades, has actually been committed. In other words, the section itself does not define contempt. This is exemplified by the language of the penal statute in its opening paragraph: "A person who commits *191 a contempt of court, of any one of the following kinds, is guilty of a misdemeanor" (emphasis supplied).
Above and beyond these considerations, it is difficult to see how the false publication, on its face, as charged in the indictment, in any way affronted the dignity and authority of the court, or impeded its proceedings in anywise. It was merely an error in reporting the testimony of an accused, and in one respect only  it named the wrong police officer. This appears from the transcript of the proceedings before the County Judge, which became a part of the indictment by reference.
Mere errors in reporting, where no willfulness is alleged, are not usually considered a sound basis for contempt proceedings (Craig v. Harney, 331 U. S. 367, 374-375). The inaccuracy charged here would seem to fall within that classification.
The alternative view would undoubtedly lead to the query of whether the statute, as construed by the court below, does not impinge upon freedom of the press as guaranteed by the Federal Constitution. The Appellate Division rejected this idea, stating, in effect, that freedom of the press did not embrace the right to publish a falsehood. The broad generalization states only a half-truth. It has been said: "any standard which would require strict accuracy in reporting legal events factually * * * would be an impossible one" (Pennekamp v. Florida, 328 U. S. 331, 371, concurring opinion of RUTLEDGE, J.). The Appellate Division also relied heavily on the case of Bridges v. California (314 U. S. 252). The Supreme Court there said: "It is to be noted at once that we have no direction by the legislature of California that publications outside the court room which comment upon a pending case in a specified manner should be punishable. As we said in Cantwell v. Connecticut, 310 U. S. 296, 307, 308, such a `declaration of the State's policy would weigh heavily in any challenge of the law as infringing constitutional limitations.' But as we also said there, the problem is different where `the judgment is based on a common law concept of the most general and undefined nature.' Id. 308. Cf. Herndon v. Lowry, 301 U. S. 242, 261-264. For here the legislature of California has not appraised a particular kind of situation and found a specific danger sufficiently imminent to justify a restriction on a particular kind of utterance. The judgments below, therefore, do not come to us encased in the armor wrought by *192 prior legislative deliberation. Under such circumstances, this Court has said that `it must necessarily be found, as an original question,' that the specified publications involved created `such likelihood of bringing about the substantive evil as to deprive [them] of the constitutional protection.' Gitlow v. New York, 268 U. S. 652, 671" (pp. 260-261).
Balanced against this, however, there should be noted a subsequent utterance of the court in the same case:
"Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be `substantial,' Brandeis, J., concurring in Whitney v. California [274 U. S. 357], 374; it must be `serious,' id. 376. And even the expression of `legislative preferences or beliefs' cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression. Schneider v. State, 308 U. S. 147, 161.
"What finally emerges from the `clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law `abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow" (pp. 262-263).
In my view of the case I do not think it necessary to reach the issue of whether the decision below might be construed as an unjustified restriction on the freedom of the press. Nevertheless, if the views of the Appellate Division were to prevail such an issue would lurk in the far-reaching consequences of such a decision.
The order should be reversed and the indictment dismissed.
Chief Judge DESMOND (dissenting).
Nearly 50 years ago the Supreme Court of Washington unanimously upheld an identical statute as against the same sort of attack mounted here (State v. Angevine, 104 Wash. 679, 684).
*193 The question is not whether certain conduct comes within the conventional concepts of "contempt of court" but whether the Legislature may validly make it a misdemeanor to publish "a false or grossly inaccurate report" of court proceedings. No reason appears why this ancient statute should not be enforced. It is not of controlling or any importance that the first sentence labels as "a contempt" each of the numerous acts and commissions listed in the section's seven subdivisions. Our only inquiry is as to the existence of legislative power to proscribe as misdemeanors such acts or omissions.
This indictment quotes a statement which appeared in defendant's newspaper that in County Court a witness named Holloway charged that he had been beaten by Police Sergeant Sardino. It alleges that the quoted part of the newspaper article was false and grossly inaccurate in that Holloway did not in fact make in court any accusations against Sardino. Certainly this alleges a violation of subdivision 7.
The second sentence of subdivision 7 says that no person can be punished under the section for publishing a full, true and fair report of proceedings had in court. While ordinarily it is a wrong to publish a false and defamatory statement concerning anyone, a newspaper is given a special privilege and immunity even as to publishing false and defamatory statements about a citizen provided they form part of a true, full and fair report of a court proceeding. However, the law is interested not only in protecting the newspaper when it publishes defamatory material which comes out in court proceedings but interested also in seeing to it that those reports of court proceedings, in order to merit such immunity, are true, full and fair. Immunity from libel for publishing defamatory matter brought out in court proceedings is subject to the condition that the publications must be true, full and fair. If they are entirely false or grossly inaccurate, criminal punishment may follow. Since there is no constitutional right to publish false statements there is in this subdivision no unconstitutional limitation of freedom of the press.
It will be the burden of the prosecution to prove that the quoted article was false or grossly inaccurate. If it turns out on the trial that the article was not "grossly inaccurate" but merely erroneous in some minor particular guilt will not be *194 established. Although it might possibly be shown in defense that the mistake was unavoidable, yet there is no need for pleading or proving intent since total falsity or gross inaccuracy prima facie makes out the crime.
The order should be affirmed.
Order reversed, etc.